## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | **COMPLAINT FOR** |
| **Plaintiff,** | § | **FORFEITURE** *IN REM* |
| | § | |
| **v.** | § | |
| | § | |
| **45.6 BITCOIN ASSOCIATED WITH** | § | **Civil Action No. 25-cv-2918** |
| **STAKE.COM ACCOUNT** | § | |
| **"CCCWOW123"** | § | |
| **Defendant.** | § | |

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against 45.6 Bitcoin (BTC) associated with Stake.com account "cccwow123," hereinafter referred to as the "Defendant Property," and alleges as follows:

### STATEMENT OF THE CASE

1.    Criminal actors used Stake.com account "ccwow123" to launder BTC, including the Defendant Property. The Defendant Property, worth approximately $5 million dollars at the time of filing, consists of a portion of funds stolen from various victims via a large-scale SIM swapping scheme.[1]

2.    The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through

---

[1] A SIM swap attack is a type of account takeover whereby a criminal actor generally targets weaknesses in multi-factor authentication and/or two-step verification in order to get access to a victim's phone number by swapping the victim's phone number to a SIM card associated with a phone in the criminal actor's control. A SIM swap is a common attack method employed in virtual currency fraud schemes and results in the theft of virtual currency from the victim.

illegal activities; to promote and enhance cooperation among federal and foreign law enforcement agencies; and most importantly, to recover assets that may be used to compensate victims.[2]

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4.      This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).

5.      Venue is proper in this judicial district under 18 U.S.C. §§ 3237, 3238; and 28 U.S.C. §§ 1355(b). Here, as Stake.com is a company located outside of the United States, the transfer of the stolen funds likely took place outside of the United States. Additionally, some of the criminal activity involved in facilitating the theft of virtual currency in this investigation occurred in Washington, D.C.

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

6.      The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of access device fraud in violation of 18 U.S.C. § 1029 and wire fraud in violation of 18 U.S.C. § 1343,; and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(a)(2)(B)(i).

7.      Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

---

[2] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

8.      18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9.      18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense.

10.     A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

11.     18 U.S.C. § 1029(a)(1), (2), and (5) makes it a crime in relevant part to knowingly, and with intent to defraud, use one or more counterfeit access devices; or to knowingly, and with intent to defraud, use one or more unauthorized access devices during any one-year period, and by such conduct obtain anything of value aggregating $1,000 or more during that period; or to knowingly and with intent to defraud, effect transactions with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000. The term "access device" is defined in 18 U.S.C. § 1029(e)(1) and includes any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

3

12.    A violation of 18 U.S.C. § 1029, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

13.    18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

14.    A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

15.    18 U.S.C. § 1956(a)(1)(A)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity. This offense is sometimes referred to as promotional money laundering.

16.    18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty concealment money laundering.

4

17.     18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

## PROPERTY INFORMATION

18.     The Defendant Property consists of 45.6 BTC traceable to the theft of funds from U.S. victims whose accounts were targeted in SIM swapping attacks. The Defendant Property amounts to funds laundered by the criminal actors via Stake.com account "ccwow123."

19.     The Defendant Property is currently in FBI custody and will be transferred to the United States Marshals Service in the District of Columbia.

## BACKGROUND RELATED TO VIRTUAL CURRENCY

20.     **Virtual Currency**: Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Bitcoin (or BTC) and ETH are currently the most well-known virtual currencies in use.

21.     **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to or from which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

5

22.     **<u>Virtual Currency Wallet</u>**: There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue are software wallets (*i.e.,* a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys). A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

23.     As discussed briefly above, wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

24.     **<u>Blockchain</u>**: The code behind many virtual currencies requires that all transactions involving that virtual currency be publicly recorded on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by a decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

25.     **<u>Blockchain Explorer</u>**: These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API[3] and blockchain nodes to

---

[3] API stands for application programming interface, which is a set of definitions and protocols for building and integrating application software.

draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

26.    **<u>Virtual Currency Exchanges (VCEs)</u>**: VCEs are trading and/or storage platforms for virtual currencies, such as BTC, ETH, PAX, etc. Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (*i.e.*, KYC checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

27.    **<u>Virtual Currency Swap Service</u>**: A virtual currency swap provides the user the ability to exchange virtual currency assets for their equivalent value in another coin or token. These swap services are usually publicly available online tools that allow users to easily conduct these swaps through the use of smart contracts.

28.    **<u>Virtual Currency Bridge Service</u>**: A virtual currency bridge provides a similar service as a virtual currency swap, in that it provides the user the ability to exchange virtual currency assets for their equivalent value in another coin or token. However, the difference between a swap and a bridge is that the bridge provides the ability to convert one's coin or token into a coin or token that resides on a different blockchain. These bridge services are usually publicly available online tools that allow users to easily conduct these conversions through the use of smart contracts.

29.    **<u>Blockchain Analysis:</u>** It is virtually impossible to look at a sole transaction on a blockchain and immediately ascertain the identity of the individual behind said transaction. That is because blockchain data generally only consists of alphanumeric strings and timestamps. That said, law enforcement can obtain leads regarding the identity of the owner of an address by analyzing

blockchain data to figure out whether that same individual is connected to other relevant addresses on the blockchain. To do so, law enforcement can use blockchain explorers, as well as commercial services offered by several different blockchain-analysis companies. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020). Through numerous unrelated investigations, law enforcement has found the information provided by these companies to be reliable.

## STATEMENT OF FACTS

30.    The Defendant Property consists of 45.6 stolen BTC associated with an account under Stake.com username "cccwow123" (hereinafter, the "Stake Account"). The Defendant Property is a portion of stolen funds traceable to the theft and unauthorized transfer of virtual currency from virtual currency wallets owned by five victims, "Victim-1," "Victim-2," "Victim-3," "Victim-4," and "Victim-5." As explained below, those thefts occurred between on or about October 29, 2022,[4] and on or about March 21, 2023.

31.    Criminal actors then laundered a portion of the stolen funds from Victim-1, Victim-2, Victim-3, Victim-4 and Victim-5 through Stake.com. By using Stake.com, the criminal actors

---

[4] All relevant dates and times included are in Coordinated Universal Time ("UTC"), the primary standard used globally to regulate clocks and time.

were able to exchange the stolen funds for other virtual currency, thereby attempting to obfuscate their origin.

32.     At the time of filing, the Defendant Property is worth approximately $5 million dollars.

### Overview Regarding the Theft of Funds from
### Victim-1, Victim-2, Victim-3, Victim-4, and Victim-5

33.     On or about October 29, 2022, criminal actors targeted Victim-1 and caused the phone number associated with Victim-1's cellphone to be swapped to a physical phone in the criminal actors' control. This type of fraud scheme is often referred to as SIM swapping. As a result of this SIM swap, criminal actors gained access to Victim-1's online accounts, and funds in the form of virtual currency were stolen and transferred from Victim-1's account at Binance.US.[5] As described in further detail below, criminal actors then unlawfully transferred 2.2 BTC (worth approximately $45,000 at the time of the transactions) from Victim-1's virtual currency account to wallets outside of Victim-1's control.

34.     On or about November 4, 2022, criminal actors targeted Victim-2 by first SIM swapping Victim-2's phone number. After the SIM swap, the criminal actors gained access to Victim-2's online accounts, and funds in the form of virtual currency were stolen and transferred from Victim-2's accounts at Coinbase and Gemini, which are both virtual currency exchanges located in the U.S.  As described in further detail below, from on or about November 4, 2022, to on or about November 7, 2022, criminal actors unlawfully transferred 35.68 BTC (worth approximately $734,000 at the time of the transactions) from Victim-2's virtual currency accounts to wallets outside of Victim-2's control.

---

[5] Binance.US is a virtual currency exchange that is located within the United States.

35.     On or about February 5, 2023, criminal actors targeted Victim-3 by first SIM swapping Victim-3's phone number. After the SIM swap, the criminal actors gained access to Victim-3's online accounts and withdrew virtual currency from Victim-3's account at Coinbase. As described in further detail below, from on or about February 6, 2023, to on or about February 13, 2023, criminal actors unlawfully transferred 88.62 BTC (worth approximately $1.98 million at the time of the transactions) from Victim-3's account at Coinbase to wallets outside of Victim-3's control.

36.     On or about February 26, 2023, criminal actors targeted Victim-4 by first SIM swapping Victim-4's phone number. After the SIM swap, the criminal actors gained access to Victim-4's online accounts and withdrew virtual currency from Victim-4's account at Coinbase. As described in further detail below, on or about February 26, 2023, criminal actors unlawfully transferred 0.81 BTC (worth approximately $19,000 at the time of the transactions) from Victim-4's account at Coinbase to wallets outside of Victim-4's control.

37.     On or about March 21, 2023, criminal actors targeted Victim-5 by first SIM swapping Victim-5's phone number. After the SIM swap, the criminal actors gained access to Victim-5's online accounts and withdrew virtual currency from Victim-5's account at Coinbase. As described in further detail below, on or about March 21, 2023, criminal actors unlawfully transferred 0.76 BTC (worth approximately $21,000 at the time of the transactions) from Victim-5's account at Coinbase to wallets outside of Victim-5's control.

**Tracing the Stolen Funds to the Stake Account**

38.     A detailed analysis of the virtual currency transactions that took place after the theft of funds from Victim-1, Victim-2, Victim-3, Victim-4, and Victim-5 revealed that the stolen funds were moved in a series of transactions through multiple virtual currency wallets and ultimately

consolidated into one wallet that was used by the criminal actors to fund the Stake Account. Because the stolen BTC was transferred and split up many times, condensing all the transaction information into one chart would be impractical. As a result, the chart below does not depict all known transactions, or even all transactions related to the activity depicted.[6] Rather, the chart illustrates the flow of the stolen BTC from each of the instant victim's accounts from one key point to another until all the funds are consolidated in the one wallet utilized by the criminal actors to fund the Stake Account:



---

[6] For example, the "Network of BTC Wallets" in the center of the diagram was actually comprised of approximately 6 BTC wallets, and the "Network of BTC Wallets" near the bottom right of the diagram was actually composed of approximately 17 BTC wallets, but each was depicted in the diagram as a cluster of five "BTC wallets" due to readability limitations in this format.

**Criminal Actors Sent Victim-1's Funds to Target Wallet 1**

39.    As stated above, funds in the form of virtual currency were stolen and transferred from Victim-1's account at Binance.US on or about October 29, 2022. The chart below singles out the unlawful transfer from Victim-1's account:



40.    As depicted above, on or about October 29, 2022, criminal actors unlawfully transferred 2.2 BTC (worth approximately $45,000 at the time of the transactions) from Victim-1's Binance.US account to a virtual currency wallet in the criminal actors' control ("Target Wallet 1"). Target Wallet 1 was comprised of 20 wallet addresses. Through proprietary blockchain tracing techniques, these 20 addresses have been identified as a cluster operating together as Target Wallet 1.

**Criminal Actors Sent Victim-2's Funds to Target Wallet 1**

41.    As stated above, funds in the form of virtual currency were stolen and transferred from Victim-2's accounts at Coinbase and Gemini from on or about November 4, 2022, to on or about November 7, 2022. The chart below singles out the unlawful transfers from Victim-2's accounts:



42.    On or about November 4, 2022, the criminal actors initiated three transactions to unlawfully transfer 18.14 BTC (worth approximately $368,000 at the time of the transactions) from Victim-2's Coinbase account. Criminal actors moved the 18.14 BTC through a series of transactions, which is consistent with money laundering techniques utilized to obfuscate the origin of funds, that resulted in 17.54 BTC (worth approximately $364,000 at the time of the transactions) consolidating into Target Wallet 1. Moving victim proceeds through multiple wallets prior to consolidating proceeds back into a common wallet is a laundering technique frequently used to obfuscate the origin of funds.

43.    On or about November 7, 2022, criminal actors unlawfully transferred 0.54 BTC (worth approximately $11,000 at the time of the transactions) from Victim-2's Gemini account to Target Wallet 1. Additionally, on or about the same day, criminal actors initiated four transactions to unlawfully transfer 17 BTC (worth approximately $355,000 at the time of the transactions) from Victim-2's Gemini account, through an intermediary wallet, and through two additional transactions, ultimately arriving in Target Wallet 1. As such, the 17.54 BTC unlawfully transferred from Victim-2's Gemini account on or about November 7, 2022, was consolidated into Target Wallet 1 on or about the same day.

44.    In total, of the 35.68 BTC (worth approximately $735,000 at the time of the transactions) that was unlawfully transferred from Victim-2's virtual currency accounts at Coinbase and Gemini, 35.08 BTC (worth approximately $730,000 at the time of the transactions) was consolidated into Target Wallet 1.

**Criminal Actors Sent Victim Funds from Target Wallet 1 to Target Wallet 2**

45.    In total, of the 37.88 BTC (worth approximately $779,000 at the time of the transactions) that was unlawfully transferred from Victim-1 and Victim-2's virtual currency accounts at Binance.US, Coinbase, and Gemini combined, 37.28 BTC (worth approximately $775,000 at the time of the transactions) was consolidated into Target Wallet 1.

46.    The chart below singles out the unlawful transfers from Target Wallet 1 to another wallet in the criminal actors' control ("Target Wallet 2"). Target Wallet 2 was comprised of two wallet addresses that have been identified as a cluster operating together as Target Wallet 2:



47.    As depicted above, after consolidating 37.28 BTC of Victim-1 and Victim-2's funds into Target Wallet 1, criminal actors then, on or about November 18, 2022, and over the course of three transactions, unlawfully transferred 34.85 BTC (worth approximately $580,000 at the time of the transactions) from Target Wallet 1 through a series of transactions. This is consistent with money laundering techniques utilized to obfuscate the origin of funds and it resulted in 36 BTC (worth approximately $765,000 at the time of the transactions) consolidating into Target Wallet 2 on or about January 14, 2023, via transaction hash 793f98f99deadfc25140d08df0bdc119864cfbc93124db5b042b014dae5a2eb7. As stated above, moving victim proceeds through multiple wallets to comingle funds prior to consolidating proceeds back into a common wallet is a laundering technique frequently used to obfuscate the origin of funds.

**Criminal Actors Sent Victim Funds from Target Wallet 2 to Target Wallet 3**

48.    The chart below singles out the unlawful transfers from Target Wallet 2 to another wallet in the criminal actors' control ("Target Wallet 3"). At the time of this application, Target Wallet 3 is comprised of 84 wallet addresses. Through proprietary blockchain tracing techniques, these addresses have been identified as a cluster operating together as Target Wallet 3:



49.    Less than an hour after consolidating 36 BTC into Target Wallet 2 on or about January 14, 2023, criminal actors then transferred 36 BTC (worth approximately $765,000 at the time of the transactions) from Target Wallet 2 to Target Wallet 3 via transaction hash 2f678032f2beca1a96667ab21dc4c22c9b62c94dc57293fda928390e9bc6ff0d.

**Criminal Actors Sent Additional Victim Funds to Target Wallet 3**

50.    The chart below singles out the unlawful transfers from Victim-3, Victim-4, and Victim-5 to Target Wallet 3:



51.     As depicted above, from on or about February 6, 2023, to February 13, 2023, criminal actors unlawfully transferred 88.62 BTC (worth approximately $1.98 million at the time of the transactions) from Victim-3's Coinbase account to wallets outside of Victim-3's control. More specifically, criminal actors made eight separate, but direct unlawful transfers from Victim-3's Coinbase account to Target Wallet 3. In total, this comprised approximately 42.3 percent of the deposits into Target Wallet 3.

52.     On or about February 26, 2023, criminal actors unlawfully transferred 0.81 BTC from Victim-4's Coinbase account to wallets outside of Victim-4's control. More specifically, criminal actors made one direct unlawful transfer from Victim-4's Coinbase account to Target Wallet 3.

53.     On or about March 21, 2023, criminal actors unlawfully transferred 0.76 BTC from Victim-5's Coinbase account to wallets outside of Victim-5's control. More specifically, criminal actors made one direct unlawful transfer from Victim-5's Coinbase account to Target Wallet 3.

**Criminal Actors Sent Victim Funds from Target Wallet 3 to and from
the Stake Account**

54.     The chart below singles out the unlawful transfers from Target Wallet 3 to and from the Stake Account:

17



55.     As depicted above, Target Wallet 3 and the Stake Account appear to engage in circular transactions, which are consistent with money laundering techniques utilized to "clean" proceeds unlawfully obtained. On or about March 20, 2023, to on or about March 22, 2023, shortly after victim funds were consolidated into Target Wallet 3, Target Wallet 3 and the Stake Account engaged in at least 32 circular transactions, to include deposits and withdrawals of BTC. Circular transactions such as these obfuscate the origin of funds by inflating the volume of inflows and outflows in an account, making the larger balance or source of funds appear legitimate. Using circular transactions is a common money laundering technique.

56.     From on or about March 20, 2023, to on or about March 27, 2023, shortly after victim funds were consolidated into Target Wallet 3, criminal actors sent 192.1 BTC (worth approximately $5.4 million at the time of the transactions) from Target Wallet 3 to the Stake Account, which as described above, is an account with a virtual currency casino. This comprised 92.6 percent of the

withdrawals from Target Wallet 3. From on or about March 21, 2023, to on or about March 22, 2023, criminal actors sent 49.5 BTC from the Stake Account to Target Wallet 3. As such, the net transfer of BTC from Target Wallet 3 to the Stake Account is 142.6 BTC (worth approximately $4 million at the time of the transactions).

57.     As described above, of the net 142.6 BTC (worth approximately $4 million at the time of the transactions) sent from Target Wallet 3 to the Stake Account, 126.17 BTC (worth approximately $3.5 million at the time of the transactions) can be traced back to funds unlawfully taken from Victim-1, Victim-2, Victim-3, Victim-4, and Victim-5. This constitutes approximately 88.5 percent of the net deposits of BTC into the Stake Account.

58.     Of the net 142.6 BTC transferred to the Stake Account by on or about March 22, 2023, criminal actors transferred 141.7 BTC (worth approximately $3.9 million at the time of the transactions) to another wallet within their control ("Target Wallet 4"). Target Wallet 4 is comprised of approximately 62 wallet addresses. Through proprietary blockchain tracing techniques, these addresses have been identified as a cluster operating together as Target Wallet 4. The chart below singles out the unlawful transfers from the Stake Account to Target Wallet 4 back to the Target Stake Account:



59.    As depicted above, the transfer of the 141.7 BTC was made over a series of 25 transfers from on or about March 23, 2023, to on or about April 8, 2023. Of the 141.7 BTC transferred from the Stake Account to Target Wallet 4, criminal actors then transferred 50 BTC (worth approximately $1.4 million at the time of the transactions) back into the Stake Account on or about April 9, 2023.

60.    Stake.com voluntarily froze the Defendant Property at the request of law enforcement.

61.    On or about July 26, 2024, the Honorable G. Michael Harvey issued seizure warrant 24-sz-31 for the Defendant Property, which was worth approximately $2.8 million at the time of seizure.

62.    On or about July 31, 2024, pursuant to the seizure warrant described above, the Defendant Property was transferred to the control of the Federal Bureau of Investigation. It is currently in the possession of the U.S. Marshals Service.

## CONCLUSION

63.    The Defendant Property consists of proceeds traceable to violations of 18 U.S.C. §

1029 and 1343. Furthermore, the Defendant Property is property involved in money laundering. Therefore, the Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 981(a)(1)(A).

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(a)(1)(C))

64.     The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1029, 1343, and 1349.

65.     Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(a)(1)(A))

66.     The Defendant Property constitutes property involved (a) domestic and international concealment money laundering transactions committed in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(a)(2)(B)(i), (b) a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, Section 1956(h).

67.     Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

### PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be

granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

*/s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

Jessica C. Peck
New York Bar No. 5188248
Trial Attorney
U.S. Department of Justice, Criminal Division
Computer Crime and Intellectual Property Section
1301 New York Avenue, N.W., Suite 600
Washington, D.C. 20005
(202) 514-1026 (main line)
jessica.peck@usdoj.gov

**VERIFICATION**

I, Justin Gallenstein, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 29th day of August 2025.

/s/ Justin Gallenstein
_____
Justin Gallenstein
Special Agent
Federal Bureau of Investigation